This is Eric McPhail. This is an insider trading case in which Eric McPhail, a granite salesman, did not trade and relayed information from an insider to his golfing buddies. In this case, there were two issues of extreme importance. One, His Honor mentioned when you decided or wrote the opinion in the Parisian case, and that's a question of whether or not there was a relationship of trust and confidence. There was no relationship of a fiduciary nature, not the classic fiduciary nature. Therefore, any relationship that would have existed… Why does it have to be a fiduciary relationship? It has to be a fiduciary or fiduciary-like relationship. Yes. Trust and confidence. Correct. All right. And His Honor indicated in Parisian there was no classic fiduciary relationship. Right. Therefore, it fell upon the rule, which is Rule 10b-5-2b-2. So the question becomes whether or not there was a relationship of trust and confidence in relation to that particular rule. Now, Chiarella and Dirks teach us that the possession of inside information, in and of itself, is not a problem. It only becomes a problem when that information is either traded on or further disclosed in breach of that relationship. So the question became whether or not such a relationship existed. And if it did, whether or not the information that MacPhail relayed was, in fact, inside information to which he knew or should have known, said the government. But, Your Honor, it should have been known. Not a civil standard, not a negligent standard, not an accidental standard. Well, on that issue, what I'm having trouble with is the judge gave an instruction. Correct. Told the jury on that issue, knew or should have known was the standard. Correct. And then the judge called counsel to sidebar to see if it was under the rule. And we say that's for criminal defense counsel. That is, like, one of the most important points during the whole trial. So you let the judge know with certainty whether there's a problem with the instructions or not. And no one asked, no one objected to the knew or should have known language. Well, I would take issue with that, Your Honor. And I take issue with that for this reason. It becomes a question of how many times must you tell a particular judge something, get denied each and every time before you have framed the issue. Let me try to understand what you're saying. Are you saying that I misread the record in concluding that at the point when the judge asked counsel to come to see if they had any objections to the charges given, no objection was made to this charge? I believe it was. I believe when it was either at that time there was a question of my preserving all of the objections that had been made previously. That objection had been made previously. What language are you referring to and in what transcript? I'm referring to the transcript immediately after the, and there might be an issue here, Your Honor. I'm not sure, although it was contained in my reply brief. There was a question that the objections were not transcribed originally. When I found out that the objections were not transcribed and the government had indicated that I had not objected, I went and asked the stenographer to transcribe those, and I believe it's in the reply brief. It's approximately seven pages. In the course of that, I indicate that I'm objecting to that particular instruction. I indicate that it should be a new standard, that it cannot be a civil standard. It cannot be a should-have-known standard, and I believe it was even broader than that. I said that I raised all the objections I've raised in the past with regard to that. Well, the record that you've given us, and maybe there's another one that you haven't referred us to, but it says, was there anything you needed, the judge, was there anything you needed to note for the record? And Mr. Centello, well, I'm going to renew my objections that I've expressed with regard to the materiality argument that I asked. I think you might have meant mutuality. Mutuality. And I believe the instruction I gave was the correct instruction. I don't see anything here on the issue that you're now talking about. And I'm looking at page 179, 7179. Is there another page we should be looking at? Mutuality is the page. That's where the objection is. Mutuality was discussed with the judge continually as to whether or not it was a new or should-have-known. The argument which was first made... Hold on a second. So are you now saying that you've never objected to the new or should-have-known language, and that what you want us to find is that your objection to the mutuality argument should be read as somehow incorporating that? No. I'm saying that that was sufficient for the judge to understand what I was objecting to. I was objecting to, clearly, the new or should-have-known standard. The judge, I believe, understood it when she said that's a correct statement of the law. It wasn't discussed in relation to anything else. She would not have responded like that if I wasn't objecting to the new or should-have-known. And in the context of mutuality, when I had always discussed it in the context of new or should-have-known, understanding that the rule itself talks about new or should-have-known, my motion to dismiss the first time I ever raised this issue, I told the judge it cannot be a civil standard. It has to be a new standard, that there has to be an agreement between the parties. There has to be an understanding. It can't be related simply by one person believing that he has a relationship of trust and confidence, therefore imposing such a trust and confidence relationship on the other. I explained to the Your Honor the notes that were made when the rules passed, indicating that it had to be mutual, but both had to understand that there was an agreement,  that there was no such relationship in this particular case. I say it not only with regard to there was no relationship, and I will address Your Honor's attention to the case of McGee, that Judge Alderson decided out of the Second Circuit, out of the Third Circuit. In McGee, the question was, it's not simply a question of whether or not there is a relationship of trust and confidence. It's whether or not the information was relayed in the confines of that relationship. In this particular situation, the evidence produced by the government was that a relationship existed between Ms. McPhail and Ms. Santa Maria with regard to marital difficulties that both of them were having. They were discussed with regard to Mr. McPhail's present divorce and some difficulties that Mr. Santa Maria had. With regard to other information in this particular case, it was clear that Mr. Santa Maria, as he self-promoted himself, he said, I'm one of the best self-promoters there is. I tell everybody how well the company is doing. There's evidence that at a Wednesday night card game, he would tell people, Angelo is doing very well today. Angelo is going to make some money this month. Angelo is going to make some money this quarter. Those are the kind of things he was disclosing to everybody. It was in relationship to what he had expressed to everybody. I'm going to cash out and I'm going to retire early and I'm going to play golf every single day. Those are the kind of things that he relates to Mr. McPhail. Mr. McPhail, in essence, figures out, wow, that must mean the company is going to do well and he relays that information. There is no indication at all. In fact, the questioning was quite crisp with regard to Mr. Santa Maria as to whether or not he had ever told McPhail not to disclose this information. He said, well, I probably said no. But doesn't he say that he twice was explicit with his friend and isn't your argument that that disclosure came late in the case and therefore should be disregarded? My argument to that is twofold. First of all, I contend that when he was questioned as to when that happened, you've got to remember this is a six-year event, four years in the investigation stage. The question was, when did you tell Mr. McPhail? Well, I don't remember. Was it the fall? Don't know. Spring? Don't know. Summer? Don't know. Was it in May? June? Don't know. Do you know the time? Do you know the place? Do you know where? No. I would have expected, Your Honor, not necessarily in cross-examination, but I would have expected the prosecutor to ask him simply, well, did you tell him before the trades? There was no evidence that any information that he disclosed was before these trades. But even looking at it the way it happened, Your Honor, this is a situation where he testifies either before the SEC, before the grand jury, and in a number of interviews in which he never, ever says that he told them not to disclose this information. Never. Not once. Then, approximately a month before trial begins, he is prompted, he's told to see if he could really remember, in the course of being told to see whether or not he can really remember, he is given a copy of McPhail's motion to dismiss, and I asked him on cross-examination, well, did you see in the motion of dismiss that I had claimed that he had never told Mr. McPhail not to disclose this information? Yes. Did you understand the significance of that? Yes, I did. Did you also read McGee? Did you read Newman? I read all of those cases. And then, several days thereafter, he took a long trip, after being told, search your memory, he took a long trip to China to do some business, and he had visions of memories. He didn't say he had a memory. You know, this is a great jury argument,  so what is it pertinent to in terms of the legal issues? It's pertinent to when there are two inferences that can be drawn, both of them logical inferences, there is nothing to support the government's inference that he was told before the event. All right. Now, would you like to move on to the other legal issues? I'd like to continue with the jury argument. I know I can. I would contend, Your Honor, that using McGee, and McGee, I think, is clear. If there are any statements made, they are made in the course of I'm going to retire. Because when the first time that he discusses anything with regard to Seneval, and that's the key, which is the last trade, he indicates that he sends a text to Eric, and during the course of that text, he realizes that he might be giving inside information. Okay? And, therefore, he stops. He doesn't give any more information. He doesn't give any information, tells him he doesn't discuss the details, just because it's a very bad day for Angelo. Notwithstanding that he realizes at that time that that information might be inside information, non-public information on which somebody could trade, the next day he goes out to dinner with Mr. McPhail, and he tells Mr. McPhail and basically repeats the same thing. And somebody might say, well, whether it's in the email, or whether it's the next day, he's still repeating the information. Whether or not Mr. McPhail... McPhail's buddies are making hundreds of thousands of dollars as a result of this information. Is there anything in the evidence suggesting that McPhail ever told Santa Maria that that's what was happening? No, Your Honor, but I would ask Your Honor to consider, if I could just finish that one thought, and I'll answer that question. That one thought is that one might think that you would say, well, that might be inside information, but within an hour, Dr. Kansian comes into, because Santa Maria invites Dr. Kansian over, and he tells Dr. Kansian the same information. I hope you don't get effed like I did, okay? He tells him about the stock is tanking. Dr. Kansian made hundreds of thousands of dollars, okay? And there was no question. So if I'm sitting there and I'm saying, wait a second, should this be confidential? And I'm telling, he's telling somebody else in my presence the same exact thing he just told me, I would contend that that can't be confidential information. That can't be information submitted in the course of trusting confidence. So it sounds to me like you're making the sufficiency of the evidence argument. You're saying that viewing the record in a light most favorable to the prosecution and assuming the jury resolved credibility issues, there's simply no evidence that would allow us to find a relationship of trust and confidence? Correct, Your Honor. And that's the argument I made in the brief and in the reply brief. It's also, I made an instruction letter, but I also made a sufficiency argument. One cannot, if you look at McGee, the individuals of McGee, it was an AA situation where they were, and the information was discussed in the course of discussing sobriety. The information here is discussed in the course of when am I going to retire. Thank you very much. Thank you. May it please the Court. My name is Andrew Loveling. I represent the United States. I apologize in advance for hacking and wheezing that you might hear. Just keep your distance. I understand, Your Honor. In light of the Parisian decision that the Court recently issued, this issue of the use of the new or should-have-known formulation is now front and center in this case. McPhail forfeited this argument below and waived it on appeal. As to forfeiture of it, counsel does not raise this argument in his objections after the jury charge. The way the Court, I think, can draw some assurance that this is so, is that counsel tells the Court he wants to preserve his mutuality argument. The transcript says materiality, but he said mutuality. I was there. He wants to preserve his mutuality argument, and what that had always meant was whether the two men defined the parameters of their confidential relationship the same way. That was roughly what counsel meant by that. The next sentence is, the Court should have used my, meaning McPhail's, proposed instruction. McPhail's proposed instructions contain the new or should-have-known formulation six times, including McPhail's proposed instruction on how to define a duty of trust and confidence. So counsel did not preserve this argument after the jury was instructed, nor does the argument appear in counsel's opening brief. Now, I will readily concede, counsel did at one point, I think it's June 15, 2015 transcript, counsel did raise the issue of whether the new or should-have-known formulation lowered the intent standard. He does eventually get to that in some argument before the jury is charged. But that goes to the government's point that he does not preserve this in his opening brief. He knows how to make the argument. He doesn't. One would only compare the reply brief with the opening brief to see that the opening brief does not make the argument that the new or should-have-known standard lowers the bar for intent, that those words, intent, mens rea, they don't even appear in the opening brief. The argument that counsel's making in the opening brief is that the new or should-have-known formulation somehow shifted the burden to McPhail to disprove that the parameters of their confidential relationship included information about their jobs. That's the argument that McPhail makes in the opening brief. You'll see in there that counsel argues that while there may have been a confidential relationship as to personal matters, marital troubles, that kind of thing, that that did not extend to professional matters. Now, as to that point, I think the record doesn't bear that out in that it is clear from Mr. Santamaria's testimony and other evidence that their relationship involved a mix of personal and professional details, meaning Mr. Santamaria was obsessed with his retirement. And so whatever was happening at work directly impacted his personal affairs because all he wanted was the stock price to go high enough that he could retire and play golf. Now, as to the evidence on the duty of trust and confidence that Mr. McPhail owed Mr. Santamaria, what counsel leaves out is while it is true that Mr. Santamaria testified at length, Mr. McPhail testified, the email evidence that exhibits 100 to 132 below overwhelmingly supports Angelo Santamaria. In an email from July of 2009, which is the beginning of the tipping period, Mr. McPhail is asked by a tippee, Eric, what is the inside scoop, that's a quote, at American Superconductor? Mr. McPhail replies, I am not allowed to say. Trust me if you want, but watch what happens to the stock price on that date. That is a direct admission by Mr. McPhail at the beginning of the tipping period that he knows that he is not supposed to be revealing this information. All the other emails that came in, and I know that at some point a few weeks ago the court asked for these to be submitted, so I know the court has them, are along this line. All of them support an inference, more than an inference, that Mr. McPhail understood this information was not supposed to be conveyed to others and was non-public. And so, I'm sorry. Okay, so this goes to two points, the sufficiency of the evidence and what harm there would be if there were a jury instructional error, correct? Yes, Your Honor, I agree. What's the SEC's present position on whether it's going to continue to ask for this or had reason to no instruction in these sorts of cases? Would you argue it wasn't plain error to use this phrase? Well, as to DOJ, I can say that I think it's fair to say that in light of the Parisian decision, we understand that this train has all but left the station, and it is safe to assume we will be avoiding the new or should have known formulation in future indictments. As to whether it would be plain error, I would argue no. At the time these instructions were given, there was a series of circuit-level decisions using the new or should have known formulation in criminal cases, and importantly, because I know at a minimum the Court pointed out in Parisian that sometimes prior courts would have cited the new or should have known language without much discussion. There is Second Circuit precedent from as recently as 2013 directly relying on the new or should have known formulation in a criminal case, that's the Gopher decision, G-O-F-F-E-R, in which the Court finds sufficiency of the evidence in part relying on the new or should have known phrase. In fact, I italicize it as a way of saying that the bar wasn't quite as high as knowledge. Now, whether that's right or wrong is besides the point for these purposes. What I'm saying here is that it would not have been clear and obvious that it was wrong to use this formulation in the jury instructions. The governing regulation has it, though I understand that that is in part beside the point. But there were... Not entirely. Is the DOJ giving the SEC any advice on whether it should be altering the language of the regulation or at least drawing a distinction between criminal and civil prosecutions? I think it's safe to say that would be above my pay grade. But I think that as far as on the civil side, there is the OBIS decision, which is the only one that I've... That's out of the Second Circuit, O-B-U-S, which is the only one that I've seen that takes a direct run at trying to reconcile the use of the new or should have known language in the regulation with the overall standard that both the SEC and we have to follow to prove securities fraud. That's the only one that I've seen. I will also note that the... Though obviously it's not anything close to mandatory authority, the pattern of instructions on the criminal side do use the new or should have known formulation. This is all going back to the point that it would not have been clear and obvious to the District Court about plain error of standard that it could not use this. And also let me note again, I think it is highly unlikely that we will be using it in future indictments. Thank you. I know it's a bit of an academic discussion, but it's interesting to us. What about we were... Santa Maria's testimony, we were told that it... There were two attacks on it. One was its credibility, put that to one side, but another was that there's no evidence at all in the record that locates in time Santa Maria's statement that he did tell MacPhail to keep the stuff quiet. Two responses. One, it is true that in Mr. Santa Maria's testimony, there is nothing to locate in time when he expressly said to MacPhail, don't repeat this stuff. In independent evidence, there is an indication of when it must have occurred. And again, I'd refer the Court back to Government's Exhibit 102, which is that email in July 2009 where Mr. MacPhail says, I'm not allowed to say. Now, he's getting that from somewhere. He's either getting it from being explicitly told that Mr. Santa Maria, don't repeat this, or he's getting it from knowing the nature of his relationship with Mr. Santa Maria, meaning based on their history, pattern, or practice during conferences, he's not supposed to say. Stay with that because he's giving in that email and in connection with that email, he's conveying some information to his golfing buddies that gives them at least a directional tip But then he's also saying, I'm not allowed to tell you more specifics. Correct. So doesn't that suggest that he had an understanding that he wasn't supposed to tell specifics, but he could tell other stuff? Why would he be telling the other stuff and not telling the specifics? I don't read the emails that way, Your Honor. I think perhaps the easiest way to answer your question is to note that, and this is one of the things I argue to the jury below, if you look at the emails in sequence, it appears that what happens here is that Mr. McPhail becomes more and more comfortable over time simply telling his friends what Mr. Santa Maria has told him because he's benefiting from it. Separate argument. And so in the beginning, he says, I'm not allowed to say, trust me if you want, but within literally a month, he's just laying out, and I'd refer the court to Gratitude Exhibit 112, which is a September 2009 email. Within a month or two, he's just laying out in detail what Mr. Santa Maria had told him. And I think it's very important to note that he never, and this was not disputed at trial, he never tells Santa Maria he's revealing this information. He never includes Mr. Santa Maria on the emails. He never even names Mr. Santa Maria in the emails. At a later date, when the investigation has begun and Mr. Santa Maria is getting a FINRA letter and he hears about the FBI snooping around, he's alarmed and he goes to Mr. McPhail and says, what about this? And even then, Mr. McPhail never mentions any of this email. That lengthy denial, that lengthy failure to disclose this to Mr. Santa Maria I think is very strong knowledge that Mr. McPhail knew he was doing wrong, knew the information was not public, knew he wasn't supposed to be doing this because it would violate an understanding that he had with Mr. Santa Maria. If there are no further questions, I think I'll sit down. No, thank you. Thank you.